## KALOS v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 17, 1925.)

No. 7067.

1. **Customs duties ⬦125—Elements of offense of receiving unlawfully imported narcotics stated.**

To make out case of violation of Act Feb. 9, 1909, § 2, as amended by Act Jan. 17, 1914 (Comp. St. § 8801), in unlawfully receiving and concealing unlawfully imported morphine, prosecution must establish that morphine was unlawfully imported, and that defendant received it, knowing it had been unlawfully imported.

2. **Customs duties ⬦134 — Evidence held to show morphine was unlawfully imported.**

Evidence *held* to sustain finding that morphine was unlawfully imported, in violation of Act Feb. 9, 1909, § 2, as amended by Act Jan. 17, 1914 (Comp. St. § 8801).

3. **Customs duties ⬦125—Prosecution must prove accused's knowledge in receiving morphine unlawfully imported.**

Regardless of statute, to warrant submitting to jury question of guilt of receiving unlawfully imported morphine, prosecution must prove that accused knew that package mailed to him contained morphine.

4. **Criminal law ⬦407(1)—Admission of testimony as to witness' conversation with another in accused's presence held error, where accused did not understand English.**

It was error to admit testimony of postmaster, who delivered package containing morphine to accused, as to conversation in English with person who acted as accused's interpreter, when accused called for package, where accused did not understand English.

5. **Criminal law ⬦744—Whether accused understood conversation in his presence held erroneously submitted to jury.**

Where testimony that accused could not understand English was not contradicted, it was error to submit to jury question whether he understood conversation in his presence.

In Error to the District Court of the United States for the District of Utah.

J. Kalos, whose true name is D. Pappadakis, was convicted of unlawfully receiving and concealing morphine unlawfully imported into the United States, and he brings error. Reversed and remanded.

F. W. James, of Salt Lake City, Utah (John D. Rice, of Salt Lake City, Utah, on the brief), for plaintiff in error.

Edward M. Morrissey, Asst. U. S. Atty., of Salt Lake City, Utah (Charles M. Morris,

U. S. Atty., and J. Kimball Smith, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Before LEWIS and KENYON, Circuit Judges, and MUNGER, District Judge.

LEWIS, Circuit Judge. Plaintiff in error, herein called defendant, whose true name is D. Pappadakis, was jointly indicted under the name of J. Kalos with one John Leventis, for violation of the Act of February 9, 1909, 35 Stat. 614, as amended by the Act of January 17, 1914, 38 Stat. 275 (Comp. St. § 8801), in that on May 16, 1924, at the City of Bingham Canyon, Salt Lake County, Utah, they did unlawfully receive and conceal a certain narcotic drug, to wit, morphine, which had been unlawfully imported into the United States, they then and there well knowing the same to have been unlawfully imported. Mr. Spencer was the first witness for the prosecution. He testified "that he was an officer in the Customs Department; that the package marked Defendant in Error's Exhibit 1 was received and opened by him, that he notified the Marshal's office and the package was turned over to the Department of Justice." Mr. Barnard, the postmaster at Bingham Canyon, was then called. He testified that he received the package on the 10th day of May, addressed in a penalty envelope, and a letter from Mr. Watts, Federal Narcotic Agent, and delivered the package to the defendant on the 15th of May, that at that time Leventis was with him. Mr. Harms testified that he was State chemist, that he "examined the Defendant in Error's Exhibit 1," analyzed the drug in the package and found it to be morphine. No one stated the quantity of morphine in the package. Mr. Fullmer testified that he was a police officer at Bingham Canyon, that he was at the postoffice and saw the defendant and Leventis go in, he first saw the package in defendant's hand and then he saw him hand it to Leventis, he took the package from Leventis, he arrested both of them and searched them at the police station and found on defendant the letter marked Exhibit 2. Exhibit 2 is a letter written in Greek, dated at Canea, Crete, Greece, on April 8, 1924, signed E. K. Pappadakis. Exhibit 3 is an English translation of that letter, which was read into the record. The prosecution offered in evidence Exhibits 1, 2, 3 and 4, but the record does not disclose what Exhibit 4 was. The postmaster further testified that when the package first came he telephoned to Leventis, who was the proprietor of the Copperfield Hotel,

and asked him if this man lived there. After that Charles Kallas came down and asked for the package. He further testified that Leventis was with defendant when he delivered the package, that Leventis did all the talking and told him defendant's name was J. Kalos, that defendant produced a letter at the request of Leventis written in Greek, in the body of which the name J. Kalos appeared. On that subject this is the postmaster's testimony:

"Leventis told me that this man was J. Kalos.

"Q. What was said, just state what he said relative to having two names. A. Leventis said that he had two names, and he had Kalos produce a letter. They produced the letter and the letter had a name in it.

"Q. What was that, if you remember? A. The same, J. Kalos.

"Q. What was the name on the letter he produced, Mr. Barnard? A. Well, it was in the body of the letter. The letter was written in Greek and the name J. Kalos appeared. That is all that was said about his having two names."

To all of this testimony defendant's counsel objected and excepted to the ruling admitting it, on the ground that it was hearsay, and assigns error.

Defendant testified that he resided in Salt Lake City, that he was in the employ of the Liberty Bottling Works there and occasionally delivered soda water in Bingham Canyon, that while in Bingham Canyon on the business of his employer he met George Kalos, who told him there was a box at the postoffice which George thought was his, but he said it was addressed to J. Kalos instead of G. Kalos, and he told the defendant to go to the postoffice and see whether it was for him, that he went to the postoffice in company with Mr. Drossos and was told there was nothing there for him, later he was at the Copperfield Hotel and Leventis told him a package had been brought to the hotel with the name J. Kalos on it and for him to go down and get it. He did not go, and later Leventis phoned him, and in response thereto he went to the postoffice and found Leventis and the postmaster there, he could not speak or understand English, he is a Greek, and Leventis did the talking, he did not understand the conversation between Leventis and the postmaster, he "told Leventis to tell the postmaster to open the package to be sure it was mine," but he did not know what Leventis told the postmaster. He further testified that he thought the package was a book because he had been told it was a book,

and did not know it contained morphine, that he does not go by the name J. Kalos but people who want to tease him call him Kalos, that the postmaster handed the package to him and he handed it to Leventis, telling him to put it in the car, he would see him up there. The two were immediately arrested and the package taken from Leventis.

E. K. Pappadakis, who apparently wrote the letter Exhibit 2, lived in Utah at one time and had returned to Greece, but how long ago does not appear. That letter is not directed to any named person, and the address on the envelope in which it came is not in the record. Defendant admitted he received it, that E. K. Pappadakis was his friend. It is written in familiar and friendly terms and contains this:

" * * * The things which you know, it is not easy, but with pull I think I will make it with pull. I will do something. I could not buy any more but only two drams, but later on will have all I want and will send it. It is not worth while about the two, but as soon as it comes will send it. Only write to me if the price is satisfactory, which you know cost 30 drachmas a dram, besides the way I get it. Write me quick as possible soon as you get my letter, so I will know how to fix things up. I can buy M and can buy 5 O K. Nothing new out here."

The letter does not purport to be in response to a letter, and defendant testified that he had not written to E. K. Pappadakis, that he did not go to the postoffice intending to receive morphine.

[1, 2] To make out its case it was necessary that the prosecution establish two facts: First, that the morphine had been unlawfully imported; and, secondly, that defendant received it knowing that it had been unlawfully imported. The first fact could not be found on the record brought here. No witness testified that the morphine had been imported. There is nothing in the testimony tending to show that the package came from Greece, from where it came, or when it came into the United States. We first find it in the hands of an officer in the Customs Department. The record does not show where he received it, when he received it or from whence he received it. It was then turned over to the Department of Justice, when, where and to whom is not stated. It got into the hands of a narcotic agent and he mailed it to the postmaster at Bingham. It was delivered by him as stated and introduced in evidence. It was not shown that it had continued throughout in the same condition as to address, markings, stamps and other indicia if any. So much for the record brought here. But after it was filed counsel stipulated in writing that Exhibits 1 and 2 might be certified as a part of the transcript of record. The clerk's certificate shows that he got the exhibits from the district attorney. Exhibit 2 is the letter in Greek signed E. K. Pappadakis, full English translation of which is in the record as Exhibit 3. We have quoted it in part. Exhibit 1 is the package. The result of our inspection of it is this: It consists of a book in Greek, in which we found a small quantity of white powder wrapped in a piece of white paper. The book is enclosed in light brown paper covering, addressed: "Mr. J. Kalos, Copperfield Hotel, Copperfield, Bingham, Utah, U. S. A." There are what we believed to be five Greek postage stamps on the covering, two post office stamp marks which are not plain enough to be read or interpreted, and on one corner of the wrapper there has been written with pen and ink: "Canea, Crete, Greece." There are other initials, marks, names and writing on the front and back of the package, which appear to have been put there after it was in the hands of the Customs officer. The record shows that the package was offered in evidence, and it is presumed that the jury inspected it. Considering the testimony before the jury, together with their inspection of the package, we are inclined to believe, and so hold, that there was sufficient evidence to sustain a finding that the morphine was sent from Greece enclosed in the book and that it was thus unlawfully imported.

[3] On the other point, that defendant knew when the package was handed to him it concealed morphine which had been unlawfully imported, we think the prosecution failed to make a case for the jury. Knowledge by defendant that morphine was in the package is an element of the crime, made so by statute. Even without the statutory requirement it would have been necessary to prove that knowledge before the case could be properly submitted to the jury. Baender v. Barnett, 255 U. S. 224, 41 S. Ct. 271, 65 L. Ed. 597. That probably could be done only by circumstantial evidence, if at all. The letter signed E. K. Pappadakis, found on the defendant, is relied on as evidence of that knowledge. For that purpose it seems to stand alone, and there must be doubt as to its sufficiency to establish the fact. It is not direct to the point but circumstantial, and we hesitate to believe that the law will accept it as of such significance

and weight that will support a conclusion which excludes every reasonable hypothesis other than that of the defendant's guilty knowledge. Its weight as a circumstance would have been greatly strengthened had it been proved that Exhibit 2 was enclosed in an envelope addressed to J. Kalos, Copperfield Hotel, and that there were two drams of morphine in Exhibit 1. But see Poy Coon Tom v. United States (C. C. A.) 7 F. (2d) 109, 110. Defendant testified that he did not know there was morphine in the package, he was in doubt whether the package was for him. He did not know why any one would send it to him. He did not receive mail addressed to J. Kalos, nor at the Copperfield Hotel. He had never resided at the Copperfield Hotel.

[4] The proof, however, on this point may be entirely different on another trial, and we rest our conclusions and ruling on the action of the court in admitting the testimony of the postmaster as to the conversation between him and Leventis, and the court's instruction in relation thereto. Defendant did not go for the package when Leventis urged him to go. Leventis then went to the postoffice and telephoned him to come there. Leventis seemed to be more anxious about the delivery than did defendant. When defendant got to the post office Leventis did all the talking with the postmaster. Defendant did not understand what they said. His conduct strongly supports his testimony. Still in doubt when the package was about to be thrust upon him at the instance of Leventis, he asked that the postmaster open it to make sure. And when it was put in his hands he immediately gave it to Leventis and told him to put it in the car up there. The postmaster testified that Leventis told him defendant's name was J. Kalos, that defendant produced a letter at the request of Leventis, in the body of which the name J. Kalos was written in Greek. The letter is not in evidence. We do not know the connection in which the name was used in the letter, and that fact seems to be negligible. The defendant did not know what was said by the postmaster and Leventis. He could not understand the English language, in which they conversed. In State v. Terline, 23 R. I. 530, 51 A. 204, 91 Am. St. Rep. 650 witnesses who did not understand the Italian language were permitted to testify to what an interpreter gave of the testimony of a witness who spoke the Italian language, in a former trial. All that they knew about the testimony of the witness in the former trial was learned from the interpretation given to the testimony of that witness. It was held that the court erred in admitting such testimony from witnesses on the second trial. In Turner v. State, 89 Tex. Cr. R. 615, 232 S. W. 801, it was held error to permit the sheriff to testify in a prosecution for robbery of a Mexican that an interpreter stated when the accused was taken before the Mexican that the Mexican identified the accused. In Salon v. State, 70 Fla. 622, 70 So. 603, it was held error to permit witnesses to testify to what was said in the presence of the accused in the English language, which he did not understand. In Territory v. Big Knot on Head, 6 Mont. 249, 11 P. 670, witnesses were permitted to testify that an interpreter stated that the defendants admitted to him that they had stolen the horses. The defendants did not understand the English language, that being the language in which the interpreter made the statement in their presence. It was said:

"Language, as well as conduct, must be understood before the person in whose presence it is made can be assumed to acquiesce therein."

[5] Defendant did not take Leventis to the postmaster to act for him as his agent in conversation with the postmaster, and the statements made there in the English language by Leventis were not admissible. The testimony that defendant could not speak nor understand English is uncontradicted. But the court instructed the jury:

"If the defendant did not understand any of the conversation which may have taken place in his presence between Leventis and the postmaster at Bingham at the time this book was delivered he should not be charged with knowing what was said. If he was unable to understand English at that time and the conversation was in English, and he did not know what was being said, it would be exceedingly unjust to base your verdict upon such conversation, he not knowing what it was. Whether he understood or did not understand, whether it may have been explained to him at the time, I will leave for you gentlemen to determine from all the facts and circumstances in the testimony given in the case concerning that transaction."

We find no basis for the last sentence of that part of the charge. It permitted the jury to decide a fact contrary to the proof, against defendant. It gave them liberty to indulge in suspicions, to hold defendant to the conversation as his admissions and that he was there to receive the package because he knew it was intended for him and he had

the right to take it. The trial Judge's certificate to the bill of exceptions recites that it "contains all of the evidence offered, admitted or adduced on the trial"; and we can find no proof, claim or intimation that defendant did or could understand the conversation or that it was explained to him.

Reversed and remanded.